COURT OF APPEALS
DECISION
DATED AND FILED

August 9, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP133**

STATE OF WISCONSIN

Cir. Ct. No. **2013ME26**

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF THE MENTAL COMMITMENT OF K. L.:

BARRON COUNTY,

PETITIONER-RESPONDENT,

V.

K. L.,

RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Barron County: MAUREEN D. BOYLE, Judge. *Affirmed*.

¶1   HRUZ, J.[1]   Kayla[2] appeals from an order extending her WIS. STAT. ch. 51 involuntary commitment and from an order for involuntary medication and

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

treatment. Kayla contends that these orders must be reversed because the circuit court failed to specify the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. under which it found her to be dangerous, as required by *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277. In response, Barron County ("the County") argues that the court's failure to reference a specific subdivision paragraph of § 51.20(1)(a)2. was harmless because Kayla has not challenged the sufficiency of the evidence to support the court's determination of dangerousness and because it is clear, based on the court's findings and the record, that the court found Kayla to be dangerous under § 51.20(1)(a)2.d.

¶2 We agree that, under the circumstances of this case, any error by the circuit court in failing to reference a specific subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. was harmless. We therefore affirm the court's order extending Kayla's involuntary commitment and the order for involuntary medication and treatment.[3]

## BACKGROUND

¶3 In March 2013, Kayla was taken into custody pursuant to a statement of emergency detention. A stipulated commitment order was entered on March 12, 2013, for a period of six months. On September 4, 2013, the parties

---

[2] For ease of reading, we use a pseudonym when referring to the appellant in this confidential matter.

[3] Kayla does not separately challenge the order for involuntary medication and treatment. She argues only that the recommitment order was erroneously entered due to the circuit court's failure to specify the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. under which it found her to be dangerous. Kayla does not dispute that, under the specific circumstances of this case, if the recommitment order was valid, then the involuntary medication order was also valid. We therefore confine our analysis to the validity of the recommitment order, without separately addressing the involuntary medication order.

stipulated to a one-year extension of Kayla's commitment. Additional orders extending Kayla's commitment were entered in March 2014, February 2015, February 2016, May 2016, May 2017, April 2018, April 2019, and April 2020.

¶4      On May 12, 2020, the County filed the petition to extend Kayla's commitment that is at issue in this appeal. The petition did not specify under which subdivision paragraph or paragraphs of WIS. STAT. § 51.20(1)(a)2. the County believed Kayla to be dangerous. The petition merely alleged that Kayla was dangerous because there was a substantial likelihood, based on her treatment record, that she would be a proper subject for commitment if treatment were withdrawn. *See* § 51.20(1)(am).

¶5      A recommitment hearing took place before the circuit court on July 1, 2020. At the hearing, psychiatrist William Platz testified that he had examined Kayla in March 2020 and had subsequently reviewed her treatment records and discussed her care with her treatment team. Platz's written report was received into evidence during the recommitment hearing.

¶6      Doctor Platz opined that Kayla suffers from schizophrenia, which can result in delusions and hallucinations. He testified that Kayla exhibits paranoia and threatening behavior, and he specifically noted that Kayla had threatened to punch her case manager during the previous year. Platz also testified that Kayla suffers from impaired judgment or behavior and that she shows no insight into her condition.

¶7      With respect to the issue of dangerousness, Dr. Platz opined, based on Kayla's treatment records, that there was a substantial likelihood that Kayla would again become a proper subject for commitment if treatment were withdrawn. More specifically, Platz agreed that without treatment, Kayla "would

be unable to satisfy her basic needs for … nourishment, medical care, shelter, or safety." Platz also agreed that if treatment were withdrawn, there was a substantial probability "that serious injury or serious debilitation might [imminently] ensue." In addition, Platz testified that without treatment, Kayla's impaired judgment "would result in [a] substantial probability of physical harm to herself or others."

¶8    In support of those conclusions, Dr. Platz noted that Kayla's treatment records showed she had a history of disorganized thinking and had been unable to care for herself in the past. Platz also noted that Kayla had been hospitalized at a behavioral health unit in November 2019 after "exhibiting dangerous behaviors towards herself," specifically, "severe weight loss and lack of ability [to] care for herself." During that hospitalization, it was noted that Kayla had multiple broken ribs, but Kayla did not know how those injuries had occurred. Following Kayla's November 2019 hospitalization, she was admitted to a group home and was subsequently transferred to a second group home. Platz testified that the most recent records from Kayla's group home indicated that she was having a difficult time caring for herself and completing basic activities of daily living.

¶9    Doctor Platz also observed that while living independently prior to the November 2019 hospitalization, Kayla had presented as being disheveled and wearing clothes that did not fit her properly, and she often entered public areas without appropriate attire. Platz specifically noted that Kayla had received a public nuisance citation within the past year for exposing herself to other residents of her apartment building.

¶10    Doctor Platz opined that without psychotropic medications, there was a "high probab[ility]" that Kayla's paranoia toward others and her current behaviors would escalate.  He noted that Kayla had a history of being threatening toward others when symptomatic, and he opined that such behavior would once again be a concern if treatment were withdrawn.  Platz also opined that, without a commitment order, Kayla would "discontinue psychiatric services, experience an increase in paranoia and disorganized behavior, and she [would] not have the case management services for assistance in maintaining her household."

¶11    Amelia Collins, Kayla's case manager through the Barron County Department of Health and Human Services, also testified at the recommitment hearing.  Collins testified that when Kayla was living independently, Kayla missed two scheduled appointments with her treating physician and six scheduled appointments with Collins.  Kayla also missed nine appointments to receive an injectable medication used to treat her schizophrenia.  Kayla told Collins that she did not believe she needed medications because her condition was "spiritual."  On one occasion, Kayla threatened to punch Collins if Collins came into one of Kayla's appointments.

¶12    Collins further testified that in November 2019, Kayla was admitted to an inpatient psychiatric unit for approximately two weeks after Kayla's landlord reported that Kayla was presenting in the common areas of her apartment building inappropriately dressed, with poor hygiene and grooming, and displaying odd behaviors.  At that time, Kayla had lost twenty-four pounds over the prior

ten-month period.[4]  After Kayla was discharged from inpatient treatment, she was transferred to a group home, with the plan being that she would return to her apartment upon discharge from the group home.  That did not occur, however, because staff at the group home reported two instances in which Kayla was "unconscious and unresponsive."  Kayla was therefore transferred to a different group home to ensure that she was medically stable.

¶13    Collins testified that the County's ultimate plan was for Kayla to return to her apartment.  Collins explained, however, that precautions related to the COVID-19 pandemic were making it difficult to meet that goal.  In addition, Collins testified that Kayla was not yet able to perform activities of daily living independently.   Collins explained that Kayla presented in public without appropriate clothes, causing her to expose herself, presented with poor hygiene and grooming, and was not oriented to time.  Collins acknowledged that Kayla had made progress in those areas while in the group home, but she explained that Kayla required "prompts" from the group home's staff to complete activities of daily living, such as showering, performing hygiene-related tasks, and preparing meals.  Collins also testified that, in the fall of 2019, Kayla's landlord informed Collins that if Kayla did not "get mental health care," the landlord would likely pursue eviction because Kayla "was making the apartment [building] … not livable for other residents."

---

[4]  During her testimony at the recommitment hearing, Kayla asserted that she is five feet, four inches tall, that she previously weighed 147 pounds, and that she "got down to 110 pounds" because she wanted to lose weight.  Kayla's daughter testified that Kayla has "always been a thin girl."  Nevertheless, Kayla's daughter stated she found it "surprising" that Kayla had reportedly lost twenty-four pounds "over a year."

¶14    Collins recommended that Kayla's commitment be extended for a period of one year. She specifically testified that, without treatment, Kayla would be unable to satisfy her basic needs. Upon questioning by the court, Collins agreed that the "concern" regarding Kayla was that "if she's not showing up for her appointments to get her medication, … she's not eating, she's not caring for herself," that behavior "will result in another hospitalization."

¶15    Kayla and her daughter also testified at the recommitment hearing. Thereafter, during its closing argument, the County asserted the evidence showed that Kayla was dangerous under WIS. STAT. § 51.20(1)(am) because there was a "substantial likelihood, based on [her] treatment record, that [she] would be a proper subject for [c]ommitment if treatment were withdrawn." In support of that proposition, the County cited Dr. Platz's testimony that Kayla "would become a danger to herself if treatment were withdrawn, based on her impaired judgment and her inability to care for herself and satisfy her basic needs." The County also cited Collins' testimony "along the same lines, that the concern was … by not eating, not caring for herself, not taking her medications as required, it would result in re-hospitalizations." The County argued Collins' testimony showed that when Kayla is "on her own," she "isn't able to care for herself and provide for her daily needs." The County also argued that, without the "safety net" provided by her commitment, Kayla "may not follow through with her [c]ourt-[o]rdered medications, may not follow through with her doctor's appointments."

¶16    Based on Dr. Platz's testimony and report, the circuit court found that Kayla was mentally ill and a proper subject for treatment. Turning to the issue of dangerousness, the court noted the County was required to establish a "substantial likelihood," based on Kayla's treatment records, that Kayla would

again be a proper subject for commitment if treatment were withdrawn. *See* WIS. STAT. § 51.20(1)(am).

¶17    In support of its conclusion that Kayla was dangerous under that standard, the circuit court noted the evidence showed that Kayla's condition had deteriorated in November 2019, when Kayla was missing scheduled appointments to receive her injectable medication. The court also noted it was concerning that Kayla had presented with broken ribs at that time, but she did not know how she had sustained those injuries. The court further found that Kayla's failure to dress appropriately, which caused her to expose herself to others, created "a danger to herself."

¶18    The circuit court also found that Kayla had made threats toward Collins and was clearly "paranoid about certain things." The court stated, however, that its concern regarding Kayla's dangerousness was not so much related to her being a danger to others as it was related to Kayla "just not being able to care for herself." The court explained, "[T]hat's what was demonstrated back in November, and which appears to still be somewhat of an issue; maybe not as significant as it was back in November, but it's still there." The court further stated it had "no doubt" that if Kayla stopped taking her medications, she "would not be able to care for herself" and "would significantly deteriorate such that she would, once again, be a proper subject for [c]ommitment." The court therefore concluded that the County had "met its burden in terms of the 'dangerousness' criteria."

¶19    Accordingly, the circuit court entered an order extending Kayla's commitment for a period of one year. The court also entered an order for

involuntary medication and treatment during the period of Kayla's commitment. Kayla now appeals from both orders.[5]

## DISCUSSION

### I. Mootness

¶20    Kayla acknowledges that the commitment order and the order for involuntary medication and treatment at issue in this appeal have expired.  Kayla asserts that this appeal is not moot, however, pursuant to our supreme court's recent decision in *Sauk County v. S.A.M.*, 2022 WI 46, ___ Wis. 2d ___, 975 N.W.2d 162.

¶21    *S.A.M.* held that an appeal from a recommitment order is not moot "when the direct or collateral consequences of the order persist and vacatur of that order would practically affect those consequences."  *Id.*, ¶19.  "[W]hether a collateral consequence renders an appeal not moot turns on the existence of a 'causal relationship' between a legal consequence and the challenged order."  *Id.*, ¶20.  The *S.A.M.* court concluded that "such a causal relationship exists between a recommitment order and at least two collateral consequences:  (1) the firearms ban [contained in a recommitment order]; and (2) the [committed individual's] liability for the cost of care."  *Id.*

---

[5] This appeal was placed on hold pending our supreme court's decisions in *Sheboygan County v. M.W.*, 2022 WI 40, ___ Wis. 2d ___, 974 N.W.2d 733, and *Sauk County v. S.A.M.*, 2022 WI 46, ___ Wis. 2d ___, 975 N.W.2d 162.  After those decisions were issued, Kayla filed an amended reply brief addressing their impact on this appeal, and the County filed a sur-reply brief.

¶22    More specifically, the **S.A.M.** court concluded that the continued effect of a firearms ban contained in a recommitment order is a collateral consequence of that order because "[p]revailing on appeal would vacate the recommitment order and practically alter a committed person's 'record and reputation' for dangerousness, a factor a reviewing court must consider when weighing a petition to cancel a firearms ban."  **Id.**, ¶23 (quoting WIS. STAT. § 51.20(13)(cv)1m.b.).  In addition, "if a committed person succeeds in vacating an expired recommitment order, the fact that the recommitment order no longer exists might influence the reviewing court's weighing of whether restoring gun rights would be consistent with the 'public interest.'"  **Id.** (quoting § 51.20(13)(cv)1m.b.).

¶23    With respect to liability for the cost of care, the **S.A.M.** court noted that, by statute, a committed person "shall be liable for the cost of the care, maintenance, services and supplies" related to each commitment period.  **Id.**, ¶24 (quoting WIS. STAT. § 46.10(2)).  "If the underlying commitment order is vacated, however, the liability tied to that particular commitment period no longer exists."  **Id.**  The court therefore held that "a direct causal relationship exists between vacating an expired recommitment order and removing the liability it creates, sufficient to render recommitment appeals not moot."  **Id.**

¶24    Kayla asserts that as a result of the recommitment order at issue in this appeal, she "will continue to suffer the same collateral consequences as S.A.M."  We agree that because Kayla continues to suffer these collateral consequences, this appeal is not moot, even though the recommitment order has expired.  In addition, we note that in its sur-reply brief, the County does not dispute that **S.A.M.**'s holding and analysis compel a conclusion that this appeal is not moot.  We therefore address the merits of Kayla's appellate arguments.

## II. *D.J.W.* violation

¶25   "For a person to be subject to a [WIS. STAT. ch.] 51 involuntary commitment, three elements must be fulfilled: the subject individual must be (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to [himself or herself] or others." *D.J.W.*, 391 Wis. 2d 231, ¶29.  The petitioner must prove each of these elements by clear and convincing evidence. *Id.*

¶26   In an initial commitment proceeding, the petitioner must establish that the subject individual is dangerous under one of the five subdivision paragraphs in WIS. STAT. § 51.20(1)(a)2. *D.J.W.*, 391 Wis. 2d 231, ¶30.  Each of those subdivision paragraphs requires the petitioner to "identify recent acts or omissions demonstrating that the individual is a danger to himself [or herself] or to others." *Portage County v. J.W.K.*, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509; s*ee also* § 51.20(1)(a)2.a.-e.

¶27   During a recommitment proceeding, however, the petitioner is not required to identify "recent" acts or omissions demonstrating dangerousness. Instead, the dangerousness requirement in a recommitment proceeding "may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." WIS. STAT. § 51.20(1)(am).  The recommitment standard in § 51.20(1)(am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." *J.W.K.*, 386 Wis. 2d 672, ¶19.

11

¶28 WISCONSIN STAT. § 51.20(1)(am) therefore serves as an "alternative evidentiary path" to establish dangerousness in a recommitment proceeding. ***J.W.K.***, 386 Wis. 2d 672, ¶19. Nevertheless, § 51.20(1)(am) "mandates that circuit courts ground their conclusions [regarding dangerousness] in the subdivision paragraphs of [§ 51.20(1)(a)2.]" ***D.J.W.***, 391 Wis. 2d 231, ¶41. In other words, "even though the petitioner need not identify recent acts or omissions showing dangerousness" in a recommitment proceeding, "the petitioner must still prove a substantial likelihood that the subject individual would be dangerous under one of the five standards set forth in § 51.20(1)(a)2.a.-e. if treatment were withdrawn." ***Eau Claire County v. J.M.P.***, No. 2020AP2014-FT, unpublished slip op. ¶11 (WI App June 22, 2021).[6]

¶29 To ensure that circuit courts ground their recommitment orders in the five dangerousness standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e., our supreme court held in ***D.J.W.*** that, going forward, "circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based." ***D.J.W.***, 391 Wis. 2d 231, ¶40. The court explained that this requirement serves two purposes. ***Id.***, ¶42. "First, it provides clarity and extra protection to patients regarding the underlying basis for a recommitment." ***Id.*** "Second, a requirement of specific factual findings with reference to a subdivision paragraph of … § 51.20(1)(a)2. will clarify issues raised on appeal of recommitment orders and ensure the

---

[6] An unpublished opinion issued on or after July 1, 2009, that is authored by a single judge or a member of a three-judge panel may be cited for its persuasive value. WIS. STAT. RULE 809.23(3)(b).

12

soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence." ***D.J.W.***, 391 Wis. 2d 231, ¶44.

¶30     Kayla asserts that ***D.J.W.***'s "plain language" requires a circuit court "to 'reference,' that is to actually state, which subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. the circuit court is basing the recommitment on." Kayla correctly notes that, in the instant case, the court did not specifically reference any of the subdivision paragraphs of § 51.20(1)(a)2. in either its oral ruling or its written order extending her commitment. Kayla therefore argues that the court failed to comply with ***D.J.W.***, and, as a result, her recommitment order and the associated order for involuntary medication and treatment must be reversed. In support of this argument, Kayla cites several unpublished cases, which she claims show that a circuit court in a recommitment proceeding must expressly reference one of the subdivision paragraphs of § 51.20(1)(a)2., and that an appellate court cannot infer the relevant subdivision paragraph based on the court's findings and the parties' arguments. *See **Rock Cnty. Dep't of Hum. Servs. v. J.E.B.***, No. 2020AP1954-FT, unpublished slip op. ¶¶25-26 (WI App Apr. 7, 2021); ***Sheboygan County v. M.W.***, No. 2021AP6, unpublished slip op. ¶10 (WI App May 12, 2021), *rev'd*, 2022 WI 40, ___ Wis. 2d ___, 974 N.W.2d 733; ***J.M.P.***, No. 2020AP2014-FT, ¶18.

¶31     In response, the County argues that the circuit court's failure to specify the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. under which it found Kayla to be dangerous was, at most, harmless error. In support of this claim, the County notes that Kayla has not challenged the sufficiency of the evidence to support the court's finding of dangerousness. The County also asserts that the relevant subdivision paragraph of § 51.20(1)(a)2. was "self-evident from the court's findings and [the] record." As such, the County contends that the

court's failure to comply with **D.J.W.** "has not prejudiced [Kayla's] ability to obtain meaningful appellate review."

¶32 In response to the County's harmless error argument, Kayla asserts that "a circuit court's failure to make a specific reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2., is not the type of error that is subject to harmless error review, but rather is a structural error which always requires reversal." Alternatively, even if a harmless error analysis could be applied in this case, Kayla asserts that the error here was not harmless because the circuit court "failed to make specific factual findings which would support all of the elements for the standard which the County would have this Court infer that the circuit court intended to rely upon."

¶33 We reject Kayla's argument that the circuit court committed a structural error by failing to reference a specific subdivision paragraph of WIS. STAT. § 51.20(1)(a)2.[7] Our supreme court has explained that "there are a very limited number of structural errors that require automatic reversal." **State v. Pinno**, 2014 WI 74, ¶49, 356 Wis. 2d 106, 850 N.W.2d 207. "Structural errors are different from regular trial errors because they 'are structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards.'" **Id.** (citation omitted). "Structural defects affect '[t]he entire conduct of the trial from beginning to end,'" and "[a]n error also may be structural because of the difficulty of determining how the error affected the trial." **Id.** (citation omitted). In the criminal law context, for example, the "limited class" of structural

---

[7] "Whether a particular error is structural and therefore not subject to a harmless error review is a question of law for our independent review." **State v. Nelson**, 2014 WI 70, ¶18, 355 Wis. 2d 722, 849 N.W.2d 317.

errors includes: "complete denial of the right to counsel, a biased judge, excluding members of the defendant's race from a grand jury, denial of the right to self-representation, denial of the right to a public trial, and a defective reasonable doubt instruction." *Id.*, ¶50 (footnotes omitted).

¶34    We conclude a circuit court's failure in a recommitment proceeding to reference a specific subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. does not rise to the level of the structural errors listed above. As Chief Justice Annette Kingsland Ziegler recently observed in her dissenting opinion in *Sheboygan County v. M.W.*, 2022 WI 40, ___ Wis. 2d ___, 974 N.W.2d 733, "the failure of a circuit court to state factual conclusions upon review of an established record and the failure to cite a statutory subsection are not structural errors in line with the 'complete denial of the right to counsel.'" *M.W.*, ___ Wis. 2d ___, ¶60, 974 N.W.2d at 748 (Ziegler, C.J., dissenting) (quoting *Pinno*, 356 Wis. 2d 106, ¶50). To the contrary,

> [a]ppellate courts are more than capable of reviewing a record, party arguments, and circuit court reasoning to determine if a dangerousness pathway has been met. In addition, the failure of a circuit court to be precise in its reasoning does not infect the entire recommitment proceeding with a constitutional violation.[8]

---

[8] In *M.W.*, Sheboygan County did not seek review of the court of appeals' conclusion that the circuit court had violated *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, by failing to make reference to a specific subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. *See M.W.*, ___ Wis. 2d ___, ¶5 n.2, 974 N.W.2d at 734 n.2. As a result, the majority opinion declined to address whether the circuit court's error in that regard was harmless. *M.W.*, ___ Wis. 2d ___, ¶26 n.6, 974 N.W.2d at 738 n.6.

(continued)

*Id.* (Ziegler, C.J., dissenting). For these reasons, we reject Kayla's argument that the error at issue in this appeal was structural and therefore not subject to a harmless error analysis.

¶35 We further conclude that, under the circumstances of this case, any error by the circuit court in failing to specify the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. under which it found Kayla to be dangerous was harmless.[9] "The standard for harmless error is the same for civil and criminal cases. The test is whether there is a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue." *Schwigel v. Kohlmann*, 2005 WI App 44, ¶11, 280 Wis. 2d 193, 694 N.W.2d 467 (citations omitted). "A reasonable possibility of a different outcome is a possibility sufficient to 'undermine confidence in the outcome.'" *Id.* (citation omitted). Additionally, in a recommitment proceeding "[t]he court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings that does not affect the substantial rights of either party." Sec. 51.20(10)(c).

---

In a dissenting opinion, Chief Justice Ziegler concluded that a circuit court's error in failing to comply with *D.J.W.* is subject to a harmless error analysis, and she further concluded that the circuit court's error in *M.W.* was harmless because "[t]here was substantial evidence to support the fifth pathway on dangerousness, and both medical experts and the County argued for application of that pathway before the circuit court." *M.W.*, ___ Wis. 2d ___, ¶¶46, 68, 974 N.W.2d at 742-43, 750 (Ziegler, C.J., dissenting). Justices Patience Drake Roggensack and Rebecca Grassl Bradley joined Chief Justice Ziegler's dissent. *Id.*, ¶78 (Ziegler, C.J., dissenting).

Justice Brian Hagedorn filed a concurring opinion in *M.W.*, in which he concluded the majority had properly refused to address the harmless error issue, given the procedural posture of the case. *Id.*, ¶¶40-43 (Hagedorn, J., concurring). Justice Hagedorn explained that "[t]he dissent's broader arguments [regarding harmless error], which have some force, should await a properly postured case." *Id.*, ¶43 (Hagedorn, J., concurring).

[9] Whether an error in a particular case was harmless is a question of law that we review independently. *Nelson*, 355 Wis. 2d 722, ¶18.

¶36 We agree with the County that the circuit court's error in this case was harmless for two reasons. First, as the County notes, the **D.J.W.** court implemented its requirement that circuit courts "make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based" in a case in which the appellant challenged the sufficiency of the evidence to support the circuit court's determination regarding dangerousness. *See **D.J.W.**,* 391 Wis. 2d 231, ¶¶1, 3. That context was critical to the **D.J.W.** court's reasoning. The court specifically explained that its new requirement would "provide[] increased protection to patients to ensure that recommitments are *based on sufficient evidence*" and would "clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making, *specifically with regard to challenges based on the sufficiency of the evidence.*" **Id.**, ¶¶43-44 (emphasis added).

¶37 The **D.J.W.** court further explained that when a circuit court in a recommitment proceeding does not reference a specific subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. in its decision, an appellate court is forced to engage in "guesswork" when assessing the appellant's sufficiency-of-the-evidence claim. **D.J.W.**, 391 Wis. 2d 231, ¶45. Here, however, this court is not required to engage in such "guesswork" because Kayla has not challenged the sufficiency of the evidence to support the circuit court's determination regarding dangerousness. Under these circumstances, it cannot reasonably be argued that the court's failure

to comply with ***D.J.W.*** contributed to the outcome of the proceeding or affected Kayla's substantial rights.[10]  *See **Schwigel***, 280 Wis. 2d 193, ¶11; § 51.20(10)(c).

¶38     Second, we agree with the County that, although the circuit court did not specifically cite any subdivision paragraph of WIS. STAT. § 51.20(1)(a)2., it is clear from the record that the court found Kayla to be dangerous under § 51.20(1)(a)2.d.   That subdivision paragraph provides that an individual is dangerous if he or she

> [e]vidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness.

Sec. 51.20(1)(a)2.d.

¶39     During its oral ruling, the circuit court stated that if Kayla were no longer committed, "there's no doubt in my mind that she would stop taking her medications; *that she would not be able to care for herself*, and that she would significantly deteriorate such that she would, once again, be a proper subject for [c]ommitment."  (Emphasis added.)   In support of its determination regarding

---

[10] The County also correctly notes that, in each of the unpublished cases that Kayla cites in which a recommitment order was reversed based on the circuit court's failure to comply with ***D.J.W.***, the appellant expressly argued that the evidence was insufficient to support the court's determination regarding dangerousness.  *See **Rock Cnty. Dep't of Hum. Servs. v. J.E.B.***, No. 2020AP1954-FT, unpublished slip op. ¶1 (WI App Apr. 7, 2021); ***Sheboygan County v. M.W.***, No. 2021AP6, unpublished slip op. ¶1 (WI App May 12, 2021), *rev'd*, 2022 WI 40, ___ Wis. 2d ___, 974 N.W.2d 733; ***Eau Claire County v. J.M.P.***, No. 2020AP2014-FT, unpublished slip op. ¶1 (WI App June 22, 2021).  Again, Kayla has not raised a sufficiency-of-the-evidence argument in this appeal.

dangerousness, the court cited evidence regarding specific events that had occurred in 2019, including Kayla's failure to keep her appointments and take her medications consistently, her presenting with broken ribs for which she had no explanation, her exposing herself in public by not dressing appropriately, and her failure to adequately feed and care for herself. The court explained that, based on this evidence, it was not necessarily concerned with Kayla being a danger to other people, but it instead believed her to be dangerous as a result of "not being able to care for herself."

¶40 Moreover, the County introduced evidence during the recommitment hearing that specifically referenced the requirements set forth in WIS. STAT. § 51.20(1)(a)2.d. For instance, Dr. Platz testified that without treatment, Kayla "would be unable to satisfy her basic needs for … nourishment, medical care, shelter, or safety." Platz further testified that if treatment were withdrawn, there was a substantial probability "that serious injury or serious debilitation might [imminently] ensue." In its closing argument, the County expressly referenced Platz's testimony that Kayla would become a danger to herself if treatment were withdrawn based on her inability to care for herself and satisfy her basic needs. Platz's testimony tracked the language of § 51.20(1)(a)2.d., and the court relied on Platz's testimony when reaching its decision regarding dangerousness.

¶41 Collins similarly testified that without treatment, Kayla would be unable to satisfy her basic needs. Collins also testified that the "concern" regarding Kayla is that "if she's not showing up for her appointments to get her medication, … she's not eating, she's not caring for herself," that behavior "will result in another hospitalization." This testimony further indicated that the County believed Kayla to be dangerous under the standard set forth in WIS. STAT. § 51.20(1)(a)2.d. Indeed, the County cited Collins' testimony during its closing

argument in support of the proposition that, when Kayla is "on her own," she "isn't able to care for herself and provide for her daily needs."

¶42 "We do not require courts to use magic words." *M.W.*, ___ Wis. 2d ___, ¶44, 974 N.W.2d at 742 (Ziegler, C.J., dissenting); *see also **Marathon County v. D.K.***, 2020 WI 8, ¶66, 390 Wis. 2d 50, 937 N.W.2d 901 (Rebecca Grassl Bradley, J., concurring) ("We do not impose a 'magic words' requirement in the law and this court has repeatedly rejected them."). Here, although the circuit court did not specifically cite any of the subdivision paragraphs of Wis. Stat. § 51.20(1)(a)2., it is clear from the court's oral ruling—when viewed in the context of the evidence and arguments presented by the County—that the court found Kayla to be dangerous under § 51.20(1)(a)2.d. Kayla does not argue that the evidence was insufficient for the court to find her dangerous under that subdivision paragraph. Under these circumstances, any error by the court in failing to reference § 51.20(1)(a)2.d. was harmless. In other words, there is no reasonable possibility that the court's error in failing to reference § 51.20(1)(a)2.d. contributed to the outcome of the recommitment proceeding or affected Kayla's substantial rights. *See **Schwigel***, 280 Wis. 2d 193, ¶11; § 51.20(10)(c).

¶43 Kayla argues that affirming the circuit court's decision in this case "will simply return … the law to the status pre-*D.J.W.*, where appellate courts and litigants are left guessing as to the circuit court's reasoning in finding dangerousness." As explained above, however, we are not required to engage in such guesswork in this case because Kayla has not challenged the sufficiency of the evidence. Moreover, as we have already concluded, it is clear from the court's oral ruling and from the evidence and arguments presented by the County that the court found Kayla to be dangerous under Wis. Stat. § 51.20(1)(a)2.d. Under

these circumstances, we are not "left guessing" as to the basis for the court's decision.

¶44 In summary, we conclude that a harmless error analysis may be applied to the circuit court's failure to state the specific subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. under which it found Kayla to be dangerous. We further conclude that the court's error was harmless, under the circumstances of this case. We therefore affirm the order extending Kayla's commitment and the associated order for involuntary medication and treatment.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.